**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| James R. Jacobson<br>individually and on behalf of all others<br>similarly situated,<br><br>                         *Plaintiff*,<br><br>    vs.<br><br>Live Nation Entertainment, Inc. and<br>TicketMaster L.L.C.,<br><br>                        *Defendants*. | CIVIL ACTION FILE<br><br>NO. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Now comes James R. Jacobson ("Jacobson" or "Plaintiff"), on behalf of himself and all others similarly situated regarding the ticketing exchange services in the Secondary Market[1] and brings the following Class Action Complaint against Live Nation Entertainment, Inc. and TicketMaster L.L.C. (collectively "Defendants" or "Live Nation"). Plaintiff's allegations are based upon his personal knowledge, investigation of counsel, and upon information and belief as to all other matters. In this regard, Plaintiff states as follows:

I.    **INTRODUCTION**

1.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this class action on behalf of himself, and all others similarly situated. Plaintiff seeks treble damages and injunctive relief for Defendants' violations of the Sherman Antitrust Act to remedy the effects of the Defendants' past unlawful conduct, to protect free market competition from continued unlawful manipulation, and to remedy harm to ticket re-sellers, including but not limited to consumers, that have suffered and continue to suffer from the anticompetitive effects of Defendants' misconduct in

---

[1] "Primary" ticketing refers to the initial distribution of tickets for a show. "Secondary" ticketing refers to the resale of previously purchased tickets.

relation to the resale of concert and other event tickets being resold through TicketMaster in the Secondary Market.

2.    In today's music industry, artists must rely on promoters, venues, and ticketers to organize the business of playing live music.   Like all industries, genuine competition in the live music industry would provide a cost-effective and commercially reasonable experience for consumers.  Unfortunately, no genuine competition exists with respect to the purchase or sale of live event tickets in the current marketplace.

3.    Live Nation dominates three major economic markets in the United States: (1) concert promotion for major concert venues, (2) primary ticketing services for major concert venues, and (3) secondary ticketing services for major concert venues.[2] Live Nation directly manages more than 400 musical artists and controls, in total, around 60% of concert promotions at major concert venues across the country.  Live Nation also owns or controls more than 265 concert venues in North America, including more than 60 of the top 100 amphitheaters in the United States.  Its closest rival owns no more than a handful of top amphitheaters. And, through TicketMaster, Live Nation controls roughly 80% or more of major concert venues' primary ticketing for concerts and a growing share of ticket resales in the secondary market.  As a result, Live Nation and TicketMaster have continued to grow their already dominant market shares in each of the three markets by leveraging their monopoly power in each market against smaller competitors in the other two markets, as detailed herein.

4.    To protect its dominance in the market for concert promotion, Live Nation often requires that the venues with which it contracts sign anticompetitive exclusive agreements that establish Live Nation as the venues' sole concert and event promoting agent.

---

[2] Although all three markets are at issue in this Action, the third market, secondary ticketing services for major concert venues in the United States, is defined as the "Relevant Market" or the "Secondary Market."

5.     Live Nation demands that the venues for which it acts as a promoter use its wholly owned subsidiary TicketMaster as the sole ticketing agent for both primary and secondary ticketing.

6.     Because Live Nation controls hundreds of venues through leaseholds, ownership, equity interests and consumer access to the overwhelming majority of significant concerts and event tours in the United States, consumers are forced to interact, directly or indirectly, with Live Nation for all Live Nation-promoted concerts and events and to use Ticketmaster as their ticketing agent for those same concerts and events.

7.     This exclusive, anticompetitive and unlawful tying eliminates significant competition, as it boxes out all other primary and secondary ticketing agents from servicing any concerts or events where Live Nation is the promoter.

8.     Live Nation's unlawful exclusive, anticompetitive and tying of promotion services to ticket sales results in monopolistic profits as they collect both upstream revenue from the promotion of concerts and events, as well as downstream revenue from primary and secondary ticketing sales.

9.     Live Nation and its wholly owned subsidiary, TicketMaster, have used its power and influence to amass market power in virtually every aspect of the live music ecosystem. This has given Live Nation and TicketMaster the opportunity to freeze innovation and bend the industry to their own benefit. While this may be a boon to Live Nation's bottom line, there is a real cost to Americans. Today, Live Nation possesses and routinely exercises control over which artists perform, the event dates, and the venues selected.

10.     Through TicketMaster, Live Nation exclusively controls the primary purchase price and fees fans will pay to simply obtain a ticket. Live Nation's monopolistic control of the industry causes a loss of dynamism and growth that unfettered competition fosters.

11.     The real world, practical costs of Live Nation's strategy are well-known. As a result of Live Nation's requirement that TicketMaster be the sole primary ticketing agent for any venues Live Nation services, would be competitors in the primary ticketing market such as SeatGeek and StubHub, are shut out from competing in the market.  Without any threat of downward pricing pressure by competitor ticketing agents, TicketMaster is able to maintain the face-value of the tickets it sells for major concert and event venues at supracompetitive levels. TicketMaster's margins, because of its supracompetitive fees and supracompetitive face-value prices, are as high as 80% on each ticket sold.

12.     Using the supracompetitive profits that TicketMaster's business generates through its domination of the primary and secondary ticketing market for major concert venues, Live Nation maintains a stranglehold on the concert promotion market by engaging in predatory pricing for its promotion services. As a result of its predatory pricing, which often involves paying rebates to its venue clients, Live Nation is able to eliminate significant competition in the promotion market, wiping out would-be competitors who are not similarly subsidized by profits from unlawful ticket tying arrangements.

13.     Further, in the market for secondary ticketing services ("Secondary Market") for major concert venues, Defendants effectively mandate that any tickets purchased through its Primary Ticket Exchange can only be resold on the Secondary Market through TicketMaster's Secondary Ticket Exchange due to certain anticompetitive technological restraints developed and maintained by Defendants.

14.     The anticompetitive technological restraints include, among others, exploiting consumers' mobile phone technology in order to block the ability to transfer tickets instantly to secondary market purchasers not using TicketMaster's platform, as well as misusing supposed copyright protections to purport to invalidate tickets transferred outside of TicketMaster's

secondary market platform.

15.     Through these unlawful and anticompetitive restraints, TicketMaster is able both to deter most secondary ticketing agents from transacting with primary purchasers who bought from TicketMaster, and to deter many would-be secondary ticketing agents from entering the market at all, thus, virtually eliminating secondary ticketing agents in the Secondary Market.

16.     Eliminating competition in the Secondary Market enables Defendants to charge supracompetitive handling fees for reselling tickets originally purchased from TicketMaster for major concerts and events in the United States, resulting in separate harm to the Secondary Purchasers and Secondary Sellers. In short, TicketMaster's primary market platform works in tandem with its secondary market platform to distort, corrupt and restrain competition in the Secondary Market.

17.     TicketMaster primary purchasers often find out only after the fact that they cannot transfer tickets unlessTicketMaster says so. TicketMaster does this by notifying users whether their tickets are transferrable – though many users report they did not receive any advanced notice when purchasing on the TicketMaster primary market website that they could not then resell their tickets anywhere but through TicketMaster.

18.     Thus, even though the primary ticketing consumer "owns" his or her respective ticket, he or she is often effectively forced to resell the ticket through TicketMaster's Secondary Exchange.

19.     Because there is no practical alternative for reselling his or her ticket, the Secondary Seller on the Secondary Market is forced to pay a supracompetitive handling charge to TicketMaster simply for the right to sell what he or she already owns.

20.     But for Defendants' anticompetitive conduct, Plaintiff and Class Members would have paid significantly lower handling charges in the Secondary Market.

21.     The United States and certain States previously tried to protect what should be a dynamic, thriving industry through a Clayton Act Section 7 case and resulting consent decree in 2010, followed by an amended consent decree in 2020. Notwithstanding the prior case under Section 7 of the Clayton Act, Live Nation and TicketMaster have violated other antitrust laws, namely the Sherman Act, through additional, different, and more expansive forms of anticompetitive conduct and exclusionary practices.  It is those additional, different, and more expansive forms of anticompetitive conduct and exclusionary practices under the Sherman Act that are at issue here.

## II.    **THE PARTIES**

### A.    **Plaintiff and His Experience with Defendants**

22.     Plaintiff James R. Jacobson ("Jacobson" or  "Plaintiff") is an individual who enjoys music, especially when performed live.

23.     One of Jacobson's favorite bands is known as Dead & Company. Dead & Company is an American rock band that formed in 2015 with a lineup of former Grateful Dead members including Bob Weir and Mickey Hart, along with John Mayer on guitar and vocals.

24.     In May of 2023, Jacobson purchased two tickets to the Pavillion at Star Lake, Burgettstown, PA  show ("Burgettstown Venue") just outside of Pittsburgh, PA.

25.     Jacobson purchased his tickets through TicketMaster and paid $75 apiece for each ticket.

26.     The Burgettstown venue is largely an outside open-air venue.

27.     The Show was scheduled for June 5, 2023.

28.     Unfortunately, the forecast called for rain, so Jacobson decided to sell his tickets.

29.     At no time did Jacobson understand or believe that there was any alternative platform for him to sell his tickets.

30.    On June 2, 2023, Jacobson sold his tickets through TicketMaster.

31.    Jacobson sold his tickets for $95 apiece.

32.    Five to Seven Business days after TicketMaster's ticketing exchange service processed the resale of his ticket on the Secondary Market, Jacobson discovered TicketMaster had deducted a $15 "handling charge" from his gross proceeds without his knowledge or consent, netting him $80 apiece for each Burgettstown venue ticket.

33.    Upon information and belief, TicketMaster's charge was separate from the charge paid by the Secondary Purchaser of Jacobson's tickets. Thus, Jacobson paid a supracompetitive fee of almost 16% to TicketMaster solely for the right to sell his own tickets.

34.    Because he was unable to attend the Burgettstown venue show, Jacobson decided he, his wife and friends would attend the Dead & Company show in Cincinnati.

35.    The Cincinnati show was scheduled for June 13th, 2023.

36.    Jacobson purchased a total of 4 tickets to the show in Cincinnati.

37.    Jacobson purchased the tickets through TicketMaster for $80 per ticket.

38.    Unfortunately, the Pittsburgh show received some negative reviews and Jacobson again decided to pass on attending the show.

39.    Jacobson sold each ticket for $100.

40.    Five to Seven Business days later, Jacobson netted $85 per ticket.

41.    Once again, Jacobson paid a supracompetitive handling charge of almost 15% to TicketMaster solely for the right to sell his tickets.

42.    At all times, TicketMaster held the electronic ticket until the day of the event.

43.    At all times, TicketMaster led Jacobson to believe that the only way to sell his tickets was through TicketMaster.

44.    Indeed, before being able to sell the tickets, TicketMaster demanded Jacobson's

bank account information because it claimed the information was necessary to appropriately utilize TicketMaster's technological systems.

45.     When Jacobson demanded a receipt with the breakdown of the charges, TicketMaster refused to produce the documents.

46.     Jacobson's experience is typical of all TicketMaster Secondary Sellers.

47.     Jacobson's experience is common to all TicketMaster Secondary Sellers.

48.     Because all TicketMaster Secondary Sellers are subjected to supracompetitive handling charges, Jacobson's claims predominate the matters at issue in this Class Action litigation.

49.     As a direct and proximate result of Defendants' monopolistic hold over the live music industry, Jacobson  and all putative class members have been damaged by being forced to pay supracompetitive handling charges for reselling tickets through TicketMaster's ticket exchange service in the Secondary Market that were purchased from TicketMaster in the Primary Market.

## B.     DEFENDANTS

50.     According to its 2023 securities filings, Defendant Live Nation Entertainment, Inc. is the "largest live entertainment company in the world," the "largest producer of live music concerts in the world," and "the world's leading live entertainment ticketing sales and marketing company," and it owns, operates, leases, has equity interest in, or has exclusive booking rights and/or significant influence over 373 venues globally and more than 265 in North America.

51.     Defendants either own or control, through long-term leases or for which it has the exclusive right to determine who performs at the venue, 60 of the top 100 amphitheaters in the United States. Control over a venue not only confers on Live Nation the ability to dictate whether fans can see a particular artist they love, but in many cases provides control over m a host of additional revenue streams ranging from sponsorships to food and beverage sales.

52.     Live Nation's business brings in over $22 billion dollars in revenue a year globally.

Live Nation divides its business into three segments: Concerts (e.g., promotions, venue management, and music festival production), Ticketing (e.g., TicketMaster business), and Sponsorship and Advertising. In 2023, Live Nation generated $18.8 billion in Concert revenue, $2.9 billion for Ticketing, and $1.1 billion for Sponsorship & Advertising.

53.    Defendant TicketMaster L.L.C. is a wholly owned subsidiary of Live Nation (collectively referred to as "Live Nation" herein). TicketMaster provides primary and secondary ticketing services, which sells tickets to fans in the Primary Market and permits resale in the Secondary market. TicketMaster is at least eight times larger than  its closest competitor.

## III.    JURISDICTION AND VENUE

54.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337, Section 1 and 2 of the Sherman Act, 15 U.S.C. § 1, *et seq*., and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, because Plaintiff alleges violations of federal law.

55.    This Court has personal jurisdiction over both of the Defendants because Defendants transact business in this District and caused injury in this District through their anticompetitive conduct.

56.    Venue is proper in this District pursuant to the Sherman Act because Defendants are licensed to do business in this District, and a substantial portion of the affected interstate commerce described herein was carried out in this District.

## IV.    FACTUAL BACKGROUND

### A.  Primary Market For Live Concerts

57.     In today's music industry, live concerts are complex productions involving thousands of choices to bring together artists and their fans on a particular date and time. Staging a single concert at a major concert venue—let alone an entire tour—involves months of preparation and

requires the orchestrated support of many intermediaries in multiple roles. Among the decisions that will most impact the overall experience of fans include what venue will host a particular live music experience, who will promote the event, and who will ticket the event.

58.    The planning of a concert predictably begins with an **artist**[3] who decides to share their music and the artistic vision for the presentation of that music with their fans. For artists, the decision to perform live and share music in this medium is an important opportunity to publicly display their art, but also to generate and continue to cultivate enduring relationships with their fans who appreciate and patronize that art.

59.    Artists are the principal draw for a live music event and drive demand for all subsequent links in the live music industry services chain. Additionally, the income earned from concerts generally represents a substantial part of artists' compensation for their creative and performance labor.

60.    **Managers and agents** typically assist artists to achieve these goals. Managers and agents guide artists' professional lives, including touring, and are often compensated based on a share of the artist's revenues or profit streams. Live Nation manages more than 400 artists in the United States and is currently the largest manager of artists in the music industry.

61.    Today, artists planning to conduct a tour at major concert venue levels will often use a single company to provide and/or coordinate promotions for the entirety of the tour. Live Nation is the largest promoter of these types of tours in the United States, promoting over 60% of the shows at major concert venues in the nation.

62.    Live Nation is the largest concert promoter in the United States. Live Nation

---

[3] As used in this Complaint, "artist" refers to all entertainers and events, who make similar choices in planning their performances and face similar competitive conditions.

separately provides and is compensated for primary ticketing services to venues. No other promoter in the United States can rival Live Nation's venue networks, scale, reach, and connections to compete to promote national tours for major artists on a regular basis.

63.     The second major decision an artist—supported by their manager and/or agent— must make is which concert **venues** to use at various stops on a national tour. Concert venues are the physical spaces or facilities that host live music. Venues compete to attract artists to perform at their facility, and artists may choose where to perform based on a variety of characteristics, including the venue's ambiance, capacity, location, and acoustics. Sometimes a venue owner separately contracts with a promoter, like Live Nation, to provide that promoter with financial incentives for booking and promotions services over an extended period of time, which predictably can lead a promoter to steer artists it promotes to perform at the venue. Other times venues provide these incentives on a show-by-show basis.

64.     Concert venue operators provide access to and maintain the facilities where concerts are held and oversee the venue's associated services, such as concessions, parking and security. Along with the rental fee received from the promoter, venues generally take a share of proceeds from concessions, parking, and merchandise sales. Concert venues that contract with TicketMaster have also, in recent years, begun to take a portion of the fees added to the face-value of the tickets for events at the venue. Similar to the promoter, the more tickets sold (and the more patrons that attend), the more money a concert venue operator makes.

65.     Regarding ticket sales, concert venue operators have two options: either to manage the sale of primary ticket inventory themselves or contract with a third party to handle the sale process for them. Managing and selling concert venue tickets is technologically and operationally complex and time consuming, so most concert venue operators choose the latter option and contract with primary ticketing service providers (generally, TicketMaster) for comprehensive ticketing

solutions on the primary market. On information and belief, Live Nation is the second-largest concert venue operator/owner in the United States and exclusively utilizes TicketMaster for these services.

66.     Live Nation owns, operates, or otherwise controls more than 265 venues across North America. As artists grow their popularity, this early access enhances Live Nation's ability to funnel artists through the vast array of Live Nation products and services in the modern live music ecosystem. Live Nation's control over access to so many popular venues across the country gives it outsized power and control in this industry.

67.     Primary ticketing service providers contract with venues to manage and sell primary ticket inventory for events at a specific venue. Primary ticketing service providers create "back-end" inventory management systems and provide "front-end" support, including customer service, shipping, fulfillment services, as well as the technology (and staff) to allow concert venue operators to sell tickets through their box offices. The primary ticketing service providers (like TicketMaster) provide primary ticketing services to primary ticket purchasers by acting as a distributor, selling the primary ticket inventory made available to them through means such as the internet, call centers, retail outlets, and/or box offices.

68.     Primary ticketing service providers generate profits by applying additional charges to the price of tickets sold to primary purchasers. The overall price a consumer pays on a primary market ticket purchase therefore includes the face-value of the ticket, as well as a variety of fees on top of/in addition to the face-value of a ticket. Typically, these are described as "convenience," processing," "service," "facility" and/or "delivery" fees, which, as many consumers can attest, now constitute a substantial portion of the overall cost of the ticket.

69.     Today, almost all major concert venues contract with a **primary ticketer** to handle the sale of tickets. Today, most tickets are sold through the internet and mobile applications, with

the most common delivery method being electronic delivery to fans' mobile phones. The vast majority of major concert venues have an exclusive arrangement with a primary ticketer, most often TicketMaster, who is entitled to manage and sell tickets on behalf of the initial rights holder—for concerts, this is typically the artist—for all events at that venue. The primary ticketer manages ticketing inventory and provides the technology for online ticketing, accounting, payment processing, and other administrative capabilities.

70.     Live Nation's subsidiary, TicketMaster, is the largest primary ticketer in the United States. TicketMaster's dominance is especially apparent among major concert venues. In 2022, TicketMaster's share of primary ticketing for NBA and NHL arenas exceeded 70%,. By Defendants' own count, TicketMaster provides primary ticketing services to over 10,000 venues and has a renewal rate "exceeding 100%," because there is no effective competition to TicketMaster when these long-term, exclusive dealing contracts expire.

71.     TicketMaster typically contracts to be the exclusive ticketer for a major concert venue for a period of many years, offering venues up-front payments in the form of signing bonuses and sponsorships. These exclusive agreements contractually bar any option of having more than one ticketing company offering differentiated services to fans at such venues for a single show or even across shows, with very limited exceptions. This model that locks in the certainty of exclusivity over the dynamism of open competition is an intentional business strategy found in the TicketMaster-dominated primary ticketing market in the United States but does not burden competition for such services in many other parts of the world not dominated by TicketMaster.

72.     According to TicketMaster, its agreements with concert venues have terms that may exceed a decade in length. To entice concert venues to enter into such exclusive dealing arrangements, TicketMaster offers substantial up-front payments and subsidies that can run into millions of dollars that are contingent on exclusivity. Those up-front payments act as a barrier to

entry for smaller competitors and act as an additional mechanism to maintain TicketMaster's dominance.

### B. Secondary Markets For Live Concerts

73.     The multiple actions against Defendants pertain to three pertinent service markets: (1) concert and event promotion services for major venues within the United States, (2) primary ticketing services for major venues in the United States, and (3) secondary ticketing services for major United States venues.  Defendants have a dominant market share and monopoly power in each of these three markets.

74.     This Action focuses on the third of the relevant service markets, the Secondary Market, which is the secondary ticketing services market for major concert and event venues within the United States.

75.     Secondary Ticket Exchanges help facilitate the resale of tickets, and they provide an important role in the music and event industry.  Functioning similar to online auction websites, a Secondary Ticket Exchange creates an online platform that allows ticketholders to post their ticket(s) for sale.  The price set for a ticket on a Secondary Ticket Exchange is a function, in significant part, of the prices posted for similar tickets on other Secondary Ticket Exchanges.  These platforms offer search tools for potential buyers to find tickets for desired events.  If a purchaser decides they want to buy one or more tickets for sale on that platform, they fill in their purchase information, and the platform completes the sale.  Typically, the Secondary Ticket Exchange charges both the seller and the purchaser fees, usually based on the sales price of the ticket(s).  Thus, the fees charged by the exchange increase with the higher price paid for a ticket in any given transaction.

76.     Because Live Nation and TicketMaster control the venues, promotion and ticketing services, Defendants purposefully promote to the public that only a portion of the seats for a given

venue are available for any given concert or event which drives up the cost of the ticket. Then as the concert or event approaches, Defendants release additional tickets at the artificially inflated price.

77.     The live music industry recognizes that primary and secondary ticketing services are distinct. Industry sources also regularly recognize the clear difference between such services, and secondary ticketing service providers are listed and grouped in industry materials as a distinct category of provider.

78.     Several other factors also demonstrate the unique and separate nature of secondary ticketing services (as opposed to primary ticketing services) for major concert venues:

(a) Critically, the customers for secondary ticketing services for events at major concert venues are distinct from the customers of primary ticketing services for events at major concert venues. For primary ticketing services, major concert venue operators are ticket sellers who retain primary ticketing service providers to act as their distributor agent and provide a number of back-end and front-end services to sell tickets directly to fans wishing to attend an event. For secondary ticketing services, the ticket sellers are purchasers who bought a ticket on either the primary or secondary market and now wish to resell that ticket. The ticket buyers who utilize the two types of ticketing services are also distinct, in that the secondary ticket buyers are purchasers who were unable to buy tickets they wanted from the primary provider, and therefore need to look for resale options as an alternative.

(b) These customers for secondary ticketing services (both sellers and purchasers) recognize the difference between the secondary and primary ticket services markets. In  fact,  primary ticketing service providers (including TicketMaster) all  view secondary ticketing services as separate and distinct from primary ticketing services. Defendants make this distinction multiple times, including in SEC filings. For example, in Live Nation's 2020 SEC Form 10-

K disclosure statement, Live Nation repeatedly distinguishes between "ticketing services" and "ticketing resale services," noting that the former is for venues and the latter for resellers, and that the services provided through each are different. Additionally, that same disclosure distinguishes between "primary ticketing companies" and "secondary ticketing companies."

(c) All entities in the live music industry (including the Defendants themselves) recognize that secondary ticketing services have unique purposes as compared to primary ticketing services: the latter are meant to facilitate and run the original sale of tickets on a venue's behalf, and the former are meant to facilitate ticket purchasers' resale of their ticket(s) at a later date.

(d) There are distinct pricing models between the two service markets. Primary ticketing service providers generate profits by levying fees on top of a ticket's face-value. The venue operator does not pay services fees and due to recent changes in TicketMaster's business model, now often shares in a portion of the levied fees. Secondary ticketing service providers also generate profits by levying fees on secondary ticket sales, but that is where the similarity ends. Unlike in the primary market, a secondary ticketing service provider typically charges the ticket seller a fee, often a percentage of the sale price of the ticket. However, secondary ticketing service providers also charge the purchaser one or more fees on the sale, thus obtaining profits from both sides of the transaction.

(e) Demand for secondary ticketing services is not sensitive to changes in prices for primary ticketing services because such changes do not cause secondary purchasers to choose a different set of services. Put differently, it is irrelevant to secondary ticket sellers and purchasers whether the prices paid by primary purchasers to a venue's primary ticketing service provider changes in any real way. What matters for the secondary market purchaser is that they have a service available to find and purchase a resale ticket. This leaves consumers in the secondary market to be vulnerable to high prices emerging from the primary market, because they have no choice: they can either pay prices on the secondary market that often

include supracompetitive mark ups and fees or miss the event or concert.

(f) There are specialized vendors that are largely distinct between the primary and secondary ticketing service markets, and the platforms they provide are substantially different themselves. For primary ticketing service providers, the platform is venue specific, and the services provided are aimed at facilitating a sale of primary tickets (often including the high-volume rush of tickets at the initial opening of sales) as well as on-the-ground ticketing services at the actual event. For secondary ticketing service providers, the vendor must instead provide a platform with very different services and functionality. A secondary platform focuses more on connecting sellers and purchasers, and providing the necessary capabilities to complete their ticket transaction. The secondary ticketing service provider charges a fee for its services.

### C. TicketMaster's Effect on the Secondary Market

79.     In the Secondary Market, which as described above is a distinct market, TicketMaster has few competitors. Through TicketMaster's anticompetitive acts in each of the three applicable markets, TicketMaster is insulated from meaningful competition in the Secondary Market, as well as the other two applicable markets. This has created a concentration of power in Defendants' control which cannot be penetrated by any potential competitor. This consolidation of power under TicketMaster's authority creates an impenetrable barrier for any potential competitors. For instance, utilizing the widely-recognized Herfindahl-Hirschman Index (HHI) as a measure of market concentration, the post-merger HHI for primary ticketing services increased by over 2,190 points, resulting in a post-merger HHI exceeding 6,900. The United States Department of Justice's Antitrust Division considers any market with more than an HHI of more than 2,500 to be highly concentrated. TicketMaster leverages its control over this concentrated primary ticketing services market to choke off access to already supracompetitively priced tickets in the Secondary Market.

80.     In the Secondary Market, TicketMaster uses its grip over the primary market to control the secondary market for ticket sales to major concerts and events. Through the

implementation of anticompetitive technological restrictions as detailed below, TicketMaster suppresses competition in the Secondary Market by making it more difficult to resell TicketMaster's primary market tickets on any platform other than TicketMaster's secondary market platform. TicketMaster's secondary market platform thrives because TicketMaster's primary market platform works in tandem with TicketMaster's secondary market platform to distort, corrupt and restrain competition in the Secondary Market.

81.     The advent of the internet ultimately helped create, for the first time, a truly viable and robust secondary market for concert tickets in the U.S. This is because the internet's ability to connect individuals from all walks of life allowed secondary ticketing service providers to create platforms where secondary ticket sellers and purchasers could more easily connect and consummate secondary ticket sales. Unlike the pre-internet era, where secondary ticket purchasers had to actively seek out ticket brokers or scalpers at venue entrances, they could now find secondary tickets with a simple click. Likewise, ticket resellers gained a significantly broader audience through accessible electronic platforms, initially reducing transaction costs for ticket resales. These mutual conveniences propelled market growth, delivering substantial benefits to both ticket resellers and purchasers.

82.     The proliferation of the secondary market for concert tickets, however, was not without negative effects. Because a ticket reseller may charge more for secondary tickets than their face-value, opportunistic individuals and companies have built business models around buying up large amounts of primary tickets at the beginning of a general sale and then selling those tickets at a markup on the secondary market. They could do so because they and other similar opportunists lock up the supply of the tickets for a show, thereby driving up prices for fans that wanted to attend the concert. These resellers (often, ticket brokers, but also just as often run-of-the-mill scalpers) developed a number of different techniques to quickly purchase primary tickets including operating

multiple accounts simultaneously, employing small armies of ticket purchasers at the beginning of general sales, and using "bots" (programs that automatically purchase tickets online faster than any human could).

83.    TicketMaster benefited from the growth of secondary concert sales because a robust secondary market maximizes primary ticket sales. Given high demand and limited quantity on the primary market, ticket brokers and scalpers are incentivized to quickly purchase as many primary tickets as possible; the rest are then purchased by real fans. All of this frenzied purchasing during the general sale benefits the primary ticketing service provider because, as discussed above, it allows them to generate revenues by levying fees on primary ticket sales.

84.    Over the years, TicketMaster has walked a narrow line by publicly decrying ticket broker practices while privately encouraging them. Defendants began a concerted effort to grow their secondary ticketing services in addition to their dominant primary ticketing services platform so that TicketMaster could make money off the initial sales as well as resales of the very same concert tickets. Consequently, TicketMaster's anticompetitive behavior in the Secondary Market has enabled it to capture revenues from both the primary sale and resale of the same tickets. As addressed in detail below, TicketMaster's anticompetitive conduct in the Secondary Market includes acquiring horizontal competitors and would-be competitors in the Secondary Market in order to eliminate competition, using conditional licensing to stifle the free flow of tickets from TicketMaster's primary market platform onto alternative, non-TicketMaster secondary market platforms, and using technological restraints to curtail the ability of consumers to easily transfer tickets purchased initially from TicketMaster's primary market platform onto alternative, non-TicketMaster secondary market platforms. In fact, most consumers like Plaintiff, do not even know that any alternatives exist.

85.    **Acquiring Secondary Ticket Services Providers.** TicketMaster first entered the secondary ticketing services market by acquiring preexisting secondary ticket service providers. It

then initially kept the platforms separate from TicketMaster's primary ticket site for several years. However, more recently, the defendants integrated these secondary ticketing service providers into TicketMaster's comprehensive platform, such that consumers can now purchase primary or secondary tickets on TicketMaster.com or the TicketMaster mobile application and may not even know if they are purchasing a primary or secondary ticket at the time of sale.

86.     By acquiring horizontal competitors, TicketMaster removed competitors from the Secondary Market to TicketMaster's own benefit.  This, in turn, had the following effects: (1) reduced choice for consumers, as consumers no longer had as many options to choose from in the Secondary Market; (2) reduced price competition, as less competitors in the Secondary Market means TicketMaster faces less downward pressure on ticket sales in the Secondary Market due to horizontal competition; and (3) reduced incentives to innovate, as less competitors and competition in the Secondary Market means TicketMaster faces less of a need to innovate and improve the quality of its products for its consumers due to a lack of competition.

87.     **Conditional Licensing.** TicketMaster grants a conditional license to the use of its tickets and its ancillary services to users of its website and/or mobile application.  The conditional license allows users to view TicketMaster's site and access its contents only if they agree to a bevy of restrictions that prevent brokers from purchasing tickets from TicketMaster and then reselling them on rival secondary ticketing platforms.

88.     As one example, the conditional license prevents users from refreshing TicketMaster's ticketing pages "more than once during any three second interval."  The conditional license also restricts the use of "ticket bot technology," which makes it more difficult for brokers to engage in bulk purchases of tickets.  The conditional license contains many similar terms as well, and TicketMaster claims that it will put brokers to the back of the electronic line if it spots them in the queue.

89.     While Defendants assert that the conditional license benefits consumers, the truth is that it is simply one more tool for Defendants to use to effectuate their broader anticompetitive scheme.  TicketMaster, as directed by Live Nation, regularly sets aside primary tickets for ticket brokers so that those brokers can then resell those tickets.  Defendants accomplish this through "ticket banks," which are ostensibly for presale tickets, and through ticket "holds" (the allotment of total tickets "held" aside from the general sale for industry insiders).  The ticket banks have neutral names so as not to trigger fan suspicion, but the ticket banks (and the tickets placed into them) are really for the brokers.  Consequently, TicketMaster strengthens its ties with ticket brokers, amplifies primary ticket sales, and expands its secondary ticketing service business.

90.     TicketMaster's conditional license plays into this scheme by acting as the sword TicketMaster wields against ticket brokers if they do not agree to TicketMaster's anticompetitive demands.  Put simply, TicketMaster will allocate primary tickets for a broker to a ticket bank only if that broker agrees that it will resell those tickets only through TicketMaster's secondary ticket platform.  If the broker does not agree, then TicketMaster will use the conditional license to force the broker off its platform.  TicketMaster is able to do this with impunity because of the power it holds over the supply of primary tickets at major concert venues, and because Live Nation, as the dominant concert promoter in the nation, controls the vast bulk of major concert tours.  Faced with this potent combination, ticket brokers seeking to resell major concert venue seats have no other choice but to use TicketMaster's secondary ticketing services, even though TicketMaster is not a competitively attractive platform for secondary sellers as compared to TicketMaster's competitors.  Specifically, TicketMaster's competitors charge lower fees for access to their platforms as compared to TicketMaster – however, brokers cannot reap these benefits because they must appease TicketMaster's demands or risk losing access to primary market tickets.

91.     This, in turn, had the following effects: (1) reducing competition in the Secondary

Market, giving consumers less choice with respect to purchasing options and (2) creating a supply restraint that keeps primary market tickets and other secondary market tickets from being resold in the Secondary Market on a secondary ticketing services platform other than TicketMaster's secondary ticketing services platform. Reduced competition and restrained supply have the effect of distorting the Secondary Market, leading to higher prices, including both higher fees and high resale values for tickets.

92.    **Technological Limits on Transferability.** TicketMaster also limits primary purchasers on their platform from transferring their tickets through any means other than TicketMaster's secondary ticketing services platform. Defendants do so most prominently through a combination of mobile ticket and TicketMaster's branded "SafeTix" technology, although Defendants regularly attempt to limit ticket transferability through other means as well.

93.    The ultimate objective of these endeavors is to deter primary ticket purchasers from utilizing competing secondary ticketing platforms, to the detriment of competitors and to the advantage of the Defendants. This aspect of the Defendants' strategy hinges on leveraging their dominance in the primary ticketing services market, their control over a majority of concert tours in the U.S., and their capability to employ technological manipulation for anticompetitive ends.

94.    Similar to the conditional license, Defendants use mobile technology and SafeTix technology for anticompetitive, rather than procompetitive purposes. Primary ticket resellers typically purchase their tickets with the understanding that they can resell their tickets wherever and however they wish. Using typical practices, they can transfer their tickets electronically after selling through a different secondary ticketing services platform. But SafeTix primary purchasers often find out only after the fact that they cannot transfer tickets in this manner. As Defendants themselves admit, the only way a primary buyer can transfer tickets outside of TicketMaster's secondary platform is if TicketMaster says so. TicketMaster does this by notifying users whether

their tickets are transferrable – though many users report they did not receive any advanced notice when purchasing on the TicketMaster primary market website that they could not then resell their tickets anywhere but through TicketMaster.

95.    This, in turn, had the following effects: (1) reducing competition in the Secondary Market, giving consumers less choice with respect to purchasing options and (2) creating a supply restraint that keeps primary market tickets and other secondary market tickets from being resold in the Relevant Market on a secondary ticketing services platform other than TicketMaster's secondary ticketing services platform. Reduced competition and restrained supply have the effect of distorting the Secondary Market, leading to higher prices.

96.    The most evident illustration of TicketMaster's anticompetitive behavior emerges when contrasting its dominance with performances where it's not the exclusive primary ticketing service provider. In other words, when TicketMaster doesn't exclusively handle ticketing for events in the same arenas where it holds concerts, ticket prices notably decrease.

97.    Ticketmaster's overall share of resale tickets in North America has grown rapidly since 2019, accounting for nearly one third of ticket resales in 2022. Ticketmaster's rapid increase in secondary market share coincided with its launch of SafeTix technology in or about 2019.

### D.  Antitrust Injury to Plaintiff[4]

98.    As a result of Defendants' anticompetitive conduct, Plaintiff paid supracompetitive

---

[4] Several other actions relating to Defendants' monopolistic pricing have focused on different aspects of antitrust injury: (1) Quinn Emmanuel's action in the Central District of California (2:22-cv-00047) seeks to represent Direct Purchasers in the primary market; (2) Robbins Geller's action (1:24-cv-03994) and Herman Jones' action (1:24-cv-04106) both seek to represent a nationwide class of Secondary Purchasers in the Southern District of New York; (3) the DOJ's action (buttressed by thirty state AGs) in the same district (1:24-cv-03973) seeks injunctive relief for the class and damages for each participating state. In contrast, Plaintiff's action seeks to represent the only remaining unrepresented class: ***Secondary Sellers***. These individuals possessed a ticket for an event at a major concert venue in the United States originally purchased from TicketMaster who resold the ticket after July 1, 2021 to a Secondary Purchaser through TicketMaster's Secondary Ticket Exchange, who then deducted  a supracompetitive handling charge from the gross proceeds after the sale was consummated.

handling charges for secondary ticket sales through its uncontrolled fee structures. Moreover, TicketMaster has diminished competition in the Secondary Market, effectively shielding itself from significant price competition.

99.     **Harm to Competition.** Competing secondary ticketing service providers, as well as the secondary ticketing marketplace, require a free-flowing supply of primary tickets. Without a supply of primary tickets to list on their platforms, such secondary ticketing service providers cannot compete. Furthermore, competing secondary ticketing service providers have no ability to circumvent the technological limits Defendants have increasingly placed on primary ticket transferability.

100.    Additionally, Defendants' use of the conditional license to force secondary resellers to use TicketMaster's platform, as well as their limitations on primary ticket transferability, have had anticompetitive effects for both primary and secondary ticketing services markets. Among other effects, one effect is to grow TicketMaster's secondary ticketing service business at the expense of free and fair competition.

101.    This conduct, in the aggregate, suppresses the already limited supply of tickets that secondary market platforms other than TicketMaster can sell. Because of this, those secondary market platforms other than TicketMaster are routinely shut out of the Secondary Market by TicketMaster by virtue of TicketMaster's control over the secondary market sale of tickets emanating originally from TicketMaster. By choking off access to the free flow of tickets, TicketMaster is eliminating competition and, therefore, throttling price competition for downstream purchasers of tickets from TicketMaster. Because of this, the Secondary Market and purchasers of tickets in the Secondary Market from secondary platforms other than TicketMaster are impacted because the upstream elimination of price competition leads to artificially higher prices being passed down to those secondary market, non-TicketMaster purchasers.

102.    These higher prices also harm competition in the Secondary Market, because secondary ticketing platforms other than TicketMaster are unable to sell tickets at market price, driving away consumers seeking to avoid paying supracompetitive prices.  The secondary ticketing agent other than TicketMaster is then left with a choice: transact sales of overpriced tickets and face losing ticket sales in voluminous numbers or incur a loss on tickets to sell at market price.  Either way, TicketMaster's competitors cannot operate in this anticompetitive environment.

103.    **Harm to Secondary Sellers.**  Due to the conduct alleged herein, TicketMaster's branded platform, as well as its TicketExchange, TicketsNow, TM+, 3PE and Verified Tickets secondary platforms have obtained a market share exceeding 60% of the secondary ticketing services for major concert venues. Plaintiff and Class members have suffered unique and distinct antitrust injuries in the Secondary Market because TicketMaster leveraged its monopolistic power in the Secondary Ticketing Exchange to deduct supracompetitive handling charges from the gross proceeds payable to Secondary Sellers after the sale was consummated. As a result, Plaintiff and Class members were unable to pass on this supracompetitive charge to the Secondary Purchaser.

104.    But for TicketMaster's anticompetitive conduct, Plaintiff and Class members would not have been charged a supracompetitive handling charge for reselling their ticket to a Secondary Purchaser that is deducted from the gross proceeds after the sale has already been consummated.

105.    TicketMaster's growth has come at the expense of consumers because, despite the fact that TicketMaster's secondary ticketing service competitors for major concert venues charge lower fees, Defendants have used anticompetitive practices described herein in order to keep consumers from accessing those less expensive platforms.

### E.  Government Investigations

106.    Additionally, at the time of the initiation of this Action, Live Nation and

TicketMaster were under investigation by numerous governmental agencies for antitrust violations.

107.    In the summer of 2022, as the Senate Judiciary Committee held hearings about Live Nation and the lack of competition in the event ticketing primary and secondary markets, Senator Amy Klobuchar of Minnesota stated, "I just want to dispel this notion that this is not a monopoly, and then we can go from there about solutions."

108.    In January 2023, the United States Department of Justice (the "DOJ") announced that they opened an antitrust investigation into Live Nation and TicketMaster regarding abusive practices in the live music industry, and the DOJ commenced suit against Live Nation and TicketMaster on May 23, 2024.  However, when it comes to consumers, including the Plaintiff and Class members, the harm has already been done – they have been economically harmed in the form of higher ticket prices and supracompetitive fees passed down into and charged in the Secondary Market.

109.    In November 2023, a United States Senate investigative subcommittee revealed that it had issued subpoenas for Live Nation and TicketMaster following a previously unannounced months-long probe into ticket pricing and fees.  The subpoena "seeks records related to Live Nation/TicketMaster's failure to combat artificially inflated demand . . . which resulted in consumers being charged exorbitant ticket prices." According to Senator Richard Blumenthal of Connecticut, "Live Nation has egregiously stonewalled [the] inquiry into its abusive consumer practices, making the subpoena necessary."

## V.    CLASS ALLEGATIONS

110.    Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representative of the Class (hereinafter defined collectively as the "Class"), which is defined as follows:

*All individuals who owned or possessed rights to a ticket for an event at a major*

*venue in the United States that was originally purchased from TicketMaster (or one of its affiliated entities) who then resold the ticket after July 1, 2021 to a Secondary Purchaser through TicketMaster's Secondary Ticket Exchange.*

111.     Excluded from the Class are Defendants and Defendants' subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; and all judicial officers assigned to hear any aspect of this litigation.

112.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

113.     **Numerosity.**  Members of the Class are so numerous that joinder would be impracticable, as millions of Class members exist.

114.     **Commonality.**  Questions of law and fact common to the Class include:

(a)  Whether Defendants in fact engaged in anticompetitive acts aimed at unreasonably restraining competition in the Secondary Market;

(b)  Whether such conduct violates the Sherman Act and state antitrust statutes;

(c)  Whether such conduct injured the Class members; and

(d)  Whether monetary damages and injunctive relief should be provided to Class members as a result of Defendants' wrongful conduct.

115.     **Typicality.**  Plaintiff's claims are typical of those of other Class members because Plaintiff, like every other Class member, was harmed by way of the conduct as alleged herein. Plaintiff, like all other Class members, was injured by Defendants' uniform conduct.  Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, such that there are no defenses unique to Plaintiff.  The claims of Plaintiff and those of the other Class members arise from the same operative facts and are based on the same legal theories.

116.     **Adequacy of Representation.**  Plaintiff will fairly and adequately represent and protect the interests of the Class members in that he has no disabling or disqualifying conflicts of

interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights that Plaintiff suffered are typical of other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class. Plaintiff has retained counsel experienced in antitrust class action litigation, and Plaintiff intends to prosecute this action vigorously.

117.    **Superiority of Class Action.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

118.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

119.    Adequate notice can be given to Class members directly using information maintained in the Defendants' records.

120.    **Predominance.** The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

121.    This proposed class action does not present any unique management difficulties. Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit many similarly situated people

to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## FIRST CAUSE OF ACTION

## VIOLATION OF THE SHERMAN ANTITRUST ACT

## SECTION 2 – MONOPOLIZATION

## (AGAINST BOTH DEFENDANTS – ON BEHALF OF THE CLASS)

122.    Plaintiff realleges and repeats the allegations of Paragraphs 1 through 121 as if fully set forth herein.

123.    Defendants have willfully acquired and maintained monopoly power for TicketMaster in the Relevant Market.

124.    TicketMaster possesses monopoly power in the Relevant Market and TicketMaster has the power to control prices or exclude competition in the Relevant Market.

125.    TicketMaster has a market share of at least 60% of the relevant market for secondary ticketing services for major concert venues through its monopolistic conduct, including but not limited to: long-term exclusive dealing arrangements (entering into long- term exclusive arrangements with venues); coercion of disloyal customers, ticket brokers, and others (through the technological restraints as discussed); and vertically-arranged boycotts (by other ticket resellers to boycott TicketMaster's competitors for the provision of secondary ticketing services), as alleged herein.

126.    Defendants' conduct has foreclosed access to the relevant market for secondary

ticketing services for major concert venues, which is necessary to enable TicketMaster's secondary ticketing service competitors to compete.

127.    TicketMaster possesses a dominant position in the Relevant Market.

128.    Defendants' conduct is not justified, because their conduct is not intended to enhance overall efficiency and to make the Relevant Market more efficient.

129.    Defendants' conduct has a substantial effect on interstate commerce.

130.    Live Nation promoted, encouraged, aided, assisted, and/or directed TicketMaster's conduct alleged above.  Live Nation also independently participated in the anticompetitive scheme as alleged herein.

131.    Plaintiff has been injured as a result of Defendants' conduct.

132.    Plaintiff has suffered and will suffer the type of injury that the antitrust laws were intended to prevent.  Plaintiff has been injured by the harm to competition as a result of Defendants' conduct.

133.    By being required by Defendants to resell concert tickets exclusively through TicketMaster, Plaintiff also has been injured and anticompetitively deprived of consumer choice of available alternate platforms and means by which to resell such tickets in the Secondary Market.

134.    Plaintiff seeks declaratory and injunctive relief with respect to this cause of action.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE SHERMAN ANTITRUST ACT

### SECTION 1 – RESTRAINTS OF TRADE

### (AGAINST BOTH DEFENDANTS – ON BEHALF OF THE CLASS)

135.    Plaintiff realleges and repeats Paragraphs 1 through 121 as if fully set forth herein.

136.    As alleged above, Defendants and various venues, ticket brokers, artists, and others

have entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for TicketMaster in the Relevant Market.

137.    As alleged above, Defendants have induced or coerced various major concert venues, ticket brokers, artists, and others to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for TicketMaster in the Secondary Market.

138.    As alleged above, Defendants have conditioned the provision of services and access to venues over which they hold market power on the boycotting of competing primary ticketing service providers for major concert venues and the use of TicketMaster's secondary ticketing services for major concert venues.

139.    These contracts, combinations, or conspiracies include but are not limited to long-term exclusive dealing arrangements and vertically arranged boycotts.

140.    Defendants' conduct has had an anticompetitive effect in the Secondary Market.

141.    Defendants' conduct has no legitimate business purpose or procompetitive effect.

142.    There are less restrictive alternatives to the restraints Defendants imposed on the relevant markets for primary and secondary ticketing services for major concert venues.

143.    Defendants' conduct has had a substantial effect on interstate commerce.

144.    Live Nation Entertainment promoted, encouraged, aided, assisted, and/or directed TicketMaster's conduct alleged above. Live Nation Entertainment also independently participated in the anticompetitive scheme as alleged herein.

145.    Plaintiff has been or will be injured as a result of Defendants' conduct.

146.    Plaintiff has suffered and will suffer injury of the type that the antitrust laws were intended to prevent. Plaintiff has been and will be injured by the harm to competition as a result of

Defendants' conduct.

147.    Plaintiff seeks declaratory and injunctive relief with respect to this cause of action.

### THIRD CAUSE OF ACTION

**VIOLATION OF**

**THE OHIO CONSUMER SALES PROTECTION ACT**

**(Ohio Rev. Code §1345.01 *et seq.*)**

**(AGAINST BOTH DEFENDANTS – ON BEHALF OF THE CLASS)**

148.    Plaintiff realleges and repeats Paragraphs 1 through 121 as if fully set forth herein.

149.    As alleged above, Defendants and various venues, ticket brokers, artists, and others have entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for TicketMaster in the Relevant Market.

150.    As alleged above, Defendants have induced or coerced various major concert venues, ticket brokers, artists, and others to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for TicketMaster in the Secondary Market.

151.    The previously alleged conduct violates the Ohio Consumer Sales Protection Act, Ohio Rev. Code §1345.01 *et seq.*, including without limitation as an "unfair or deceptive act or practice in connection with a consumer transaction" within the meaning of Section 1345.02 of such Act.

152.    In addition, the supracompetitive handling fee charged to a Secondary Seller for reselling a ticket through TicketMaster's Secondary ticketing service is an "unconscionable act or practice in connection with a consumer transaction" within the meaning of Section 1345.03 in that:

(a) TicketMaster knowingly took advantage of the Secondary Seller's inability reasonably

to protect his or her interest, in violation of Section 1345.03(B)(1).

(b)  TicketMaster knew at the time the consumer transaction was entered into that the handling fee was substantially in excess of the price at which similar services were readily obtainable in similar consumer transactions, in violation of Section 1345.03(B)(2).

(c)  TicketMaster required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier, in violation of Section 1345.03(B)(5).

<u>**FOURTH CAUSE OF ACTION**</u>

**VIOLATION OF**

**THE OKLAHOMA CONSUMER PROTECTION ACT**

**(15 Okla. Stat. §751 *et seq.*)**

**(AGAINST BOTH DEFENDANTS – ON BEHALF OF THE CLASS)**

153.        Plaintiff realleges and repeats Paragraphs 1 through 121 as if fully set forth herein.

154.        As alleged above, Defendants and various venues, ticket brokers, artists, and others have entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for TicketMaster in the Relevant Market.

155.        As alleged above, Defendants have induced or coerced various major concert venues, ticket brokers, artists, and others to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for TicketMaster in the Secondary Market.

156.        The previously alleged conduct violates the Oklahoma Consumer Protection Act, 15 Okla. Stat. §751 *et seq.*, including without limitation as "an unfair or deceptive trade practice as defined in Section 752 of this title" as proscribed by Section 753(21) of such Act.

157.        Relatedly, the supracompetitive handling fee charged to a Secondary Seller for reselling a ticket through TicketMaster's Secondary ticketing service is an "unfair trade practice"

within the meaning of Section 752(14) of such Act in that such practice "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."

## FIFTH CAUSE OF ACTION

### VIOLATION OF

### THE IDAHO CONSUMER PROTECTION ACT

### (Idaho Code § 48-601 *et seq.*)

### (AGAINST BOTH DEFENDANTS – ON BEHALF OF THE CLASS)

158.     Plaintiff realleges and repeats Paragraphs 1 through 121 as if fully set forth herein.

159.     As alleged above, Defendants and various venues, ticket brokers, artists, and others have entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for TicketMaster in the Relevant Market.

160.     As alleged above, Defendants have induced or coerced various major concert venues, ticket brokers, artists, and others to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for TicketMaster in the Secondary Market.

161.     The previously alleged conduct violates the Idaho Consumer Protection Act, Idaho Code § 48-601 *et seq.*, including without limitation as "unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce" within the meaning of Section 48-601 of such Act.

162.     In addition, the supracompetitive handling fee charged to a Secondary Seller for reselling a ticket through TicketMaster's Secondary ticketing service is an "unconscionable method, act or practice in the conduct of any trade or commerce" within the meaning of Section 48-603C in that:

(a) TicketMaster knowingly took advantage of the Secondary Seller's inability reasonably to protect his or her interest, in violation of Section 48-603C(2)(a).

(b) TicketMaster knew at the time the consumer transaction was entered into that the handling fee was substantially in excess of the price at which similar services were readily obtainable in similar consumer transactions, in violation of Section 48-603C(2)(b).

(c) TicketMaster required the consumer to enter into a consumer transaction on terms it knew were substantially one-sided in its favor, in violation of Section 48-603C(2)(c).

(d) Ticketmaster engaged in a pattern of sales conduct that would outrage or offend the public conscience, in violation of Section 48-603C(2)(d).

## SIXTH CAUSE OF ACTION

### VIOLATION OF

### THE KANSAS CONSUMER PROTECTION ACT

### (Kan. Stat. § 50-617 *et seq.*)

### (AGAINST BOTH DEFENDANTS – ON BEHALF OF THE CLASS)

163.    Plaintiff realleges and repeats Paragraphs 1 through 121 as if fully set forth herein.

164.    As alleged above, Defendants and various venues, ticket brokers, artists, and others have entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for TicketMaster in the Relevant Market.

165.    As alleged above, Defendants have induced or coerced various major concert venues, ticket brokers, artists, and others to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for TicketMaster in the Secondary Market.

166.    The previously alleged conduct violates the Kansas Consumer Protection Act, Kan. Stat. § 50-617 *et seq.*, including without limitation as an "unconscionable act or practice in connection with a consumer transaction" within the meaning of Section 50-627(a) of such Act.

167.    Relatedly, the supracompetitive handling fee charged to a Secondary Seller for reselling a ticket through TicketMaster's Secondary ticketing service is unconscionable within the meaning of Section 50-627(b) in that:

(a) TicketMaster knowingly took advantage of the Secondary Seller's inability reasonably to protect his or her interest, in violation of Section 50-627(b)(1).

(b) TicketMaster knew at the time the consumer transaction was entered into that the handling fee was substantially in excess of the price at which similar services were readily obtainable in similar consumer transactions, in violation of Section 50-627(b)(2).

(c) TicketMaster induced the consumer to enter into a consumer transaction on terms it knew were excessively one-sided in favor of the supplier, in violation of Section 50-627(b)(5).

## PRAYER FOR RELIEF

168.    To remedy these illegal acts, Plaintiff requests that the Court:

a.  Certify the Class and appoint Plaintiff as the Class's representative;

b.  Find that Defendants' conduct was unlawful, as alleged herein;

c.  Award such injunctive relief and other equitable relief as the Court deems just and proper;

d.  Award Plaintiff and Class members statutory, actual, compensatory, consequential, treble, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

e.  Award Plaintiff and Class members pre-judgment and post-judgment interest;

f.  Award Plaintiff and Class members reasonable attorneys' fees, costs and expenses; and

g.  Grant such other relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues properly triable to a jury in this case.

Respectfully submitted,

Dated:          August 28, 2024
                New York, New Yorkp


/s/ Christopher Lovell_____
Christopher Lovell
Christopher M. McGrath
LOVELL STEWART HALEBIAN JACOBSON LLP
500 5th Avenue, Suite 2440
New York, New York 10110
Phone: (212) 608-1900
Email: clovell@lshllp.com
Attorney for Plaintiff



_____
Edward W. Cochran (0032942)
20030 Marchmont Road
Shaker Hts., Ohio 44122
PH: (216) 577-4545
Email: edward@edwcochran.com
Attorney for Plaintiff

_____
Edward A. Proctor (0069877)
4100 Embassy Parkway, Suite 200
Akron, Ohio 44333
PH: (330) 396-7900
FX :(330) 396-7901
Email: eproctor@kimassociateslaw.com
Attorney for Plaintiff



_____
Thomas J. Connick (0070527)
Schneider, Smeltz Speith Bell, LLP
1375 E. Ninth Street, Suite 900
Cleveland, Oh 44114
PH: (216) 696-4200
Email: tconnick@sssb-law.com
Attorney for Plaintiff

_____
George W. Cochran (0031691)
Law Office of George W. Cochran
1981 Crossfield Circle
Kent, Ohio 44240
PH: (330) 607-2187
Email: lawchrist@gmail.com
Attorney for Plaintiffs